# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IMC LENDING, LLC,<br>                              *Plaintiff,*<br>          v.<br><br>1301 AVE J LLC, and JOHN DOES 1-10<br>                              *Defendants.*<br><br>The Names of the "John Doe" Defendants Being Fictitious and Unknown to Plaintiffs, the Persons and Firms Intended Being Those Who May Be in Possession of, or May Have Possessory, Lien or Other Interests in, the Premises Herein Described. | Case No.: _____<br><br><br>**COMPLAINT** |

Plaintiff IMC Lending, LLC ("**Lender**"), a Delaware limited liability company, by its attorneys, DLA Piper LLP (US), as and for its Complaint against the Defendant 1301 Ave J LLC ("**Borrower**"), and John Does 1–10, alleges as follows:

## NATURE OF THE ACTION

1.      This action is brought by Lender to appoint a receiver pursuant to the Loan Documents, as defined herein, to protect Lender's secured interest in the parcel of real property known as Block 6706, Lot 48 in the Borough of Brooklyn in the City of New York, and commonly known as 1301 Avenue J, Brooklyn, New York 11235 (the "**Property**");[1] pursuant to express provisions in the Loan Documents, including an Assignment of Leases and Rents ("**ALR**").

2.      In doing so, Lender seeks to stop Borrower from converting Rent it is collecting from tenants at the Property during the pendency of Lender's foreclosure action, which Lender intends to commence through supplemental or amended pleadings in this action as soon as New

---

[1] The Property is more specifically described in **Schedule A** annexed hereto.

York's commercial mortgage foreclosure moratorium law lapses on January 15, 2022. *See* 2021 N.Y. Laws ch. 417.

3.     1301 Ave J borrowed $12,400,000 from Lender in 2017, and another $250,000 in 2019, both secured by mortgages on the Mortgaged Property. Lender agreed to amend the Loan Documents nine times in the aggregate, including during the height of the COVID-19 pandemic, to permit Borrower additional time to repay the amount due Lender under the Loan Documents.

4.     Borrower failed to repay the loan by the Maturity Date of May 10, 2020, and Lender served Borrower with notice of such default in May 2020.

5.     Foreclosure is Lender's principal remedy under the Loan Documents but Lender has been unable to foreclose on the Property due to the Executive Orders and statute restricting commercial foreclosures and precluding the Lender from initiating a commercial foreclosure proceeding.

6.     Lender intends to supplement or amend its pleadings to add causes of action for foreclosure and claims against the Borrower and Guarantors. Lender reserves all rights to do so, and, as such, the request for a temporary receiver is a path toward final and further relief involving the foreclosure and liquidation of the Property.

7.     Since Borrower defaulted in May 2020, Borrower has repeatedly trampled on Lender's rights and taken advantage of the commercial mortgage foreclosure moratorium in New York:

   a. Borrower refuses to provide information to the Lender that is required under the Loan Documents, including basic information on leases and the amount of rent collected.

   b. Borrower may not pay taxes on the Property despite having collected rents from tenants that include funds earmarked for payment of the tenant's pro-rata share of the taxes, leaving Lender to pick up the tab or risk tax liens priming its security interest in the Property.

c.  Borrower undertook renovations at the Property without Lender's consent, and then apparently fails to pay contractors for work performed at the Property, which recently resulted in over $1,000,000 in mechanics' liens being filed against the Property.

d.  Borrower undermined its contractual obligations pursuant to the parties' Assignment of Leases and Rents by (1) directing tenants to ignore the Lender's letters protecting the Lender's leases and interest, and (2) taking the Rents and failing to turn over the proceeds to the Lender or make any debt service payment or payment for the escrow for taxes and insurance. Borrower knowingly misled the tenants by falsely telling them that the ALR has no legal force or effect.

e.  Borrower touts what it knows to be an erroneous filing concerning the ALR and Mortgage to create confusion among tenants, causing them to not pay Rent required by their leases.

f.  Most recently, Borrower made a bad faith claim to "enforce" a non-existent agreement to resolve the parties' contractual dispute. That the parties had no agreement in place was no obstacle to Borrower; rather, Borrower filed a lawsuit in the Supreme Court of New York, Kings County, which Lender removed to this Court before the Honorable William F. Kuntz, II. On the eve of the Court-ordered deadline to file a receiver motion, Borrower voluntarily dismissed its case.

8.      Borrower remains in control of the Property, and its erratic behavior poses a considerable threat to Lender's interest in the Property as a secured creditor. Accordingly, Lender will seek the immediate appointment of a receiver to protect the Property.

## THE PARTIES

9.      Lender is, and at all relevant times hereinafter mentioned was, a limited liability company organized and existing under the laws of Delaware, with an address at 2901 Butterfield Road, Oak Brook, Illinois 60523.

10.     Upon information and belief, Borrower is a limited liability company organized and existing under the laws of the State of New York, with an address at 3052 Brighton 1st Street, Suite M3, 4th Floor, Brooklyn, New York, 11235, and is the owner of record of 1301 Avenue J, Brooklyn, New York 11235.

3

11.     Upon information and belief, non-party Joseph Zafarani is a natural person who resides at 1517 Ocean Parkway, Brooklyn, New York, 11230, and is the Guarantor under the Loan Documents, as hereinafter defined.  Plaintiff intends to add Mr. Zafarani as a defendant upon the expiration of the mortgage foreclosure moratorium.

12.     Upon information and belief, non-party Isaac I. Zafarani is a natural person who resides at 2184 Ocean Parkway, Brooklyn, New York, 11223, and is the Guarantor of the Loan Documents.  Plaintiff intends to add Mr. Zafarani as a defendant upon the expiration of the mortgage foreclosure moratorium.

13.     Upon information and belief, non-party Charles H. Zafarani is a natural person who resides at 16 Bridle Dr, W Long Branch, New Jersey, 07764, and is the Guarantor of the Loan Documents.  Plaintiff intends to add Mr. Zafarani as a defendant upon the expiration of the mortgage foreclosure moratorium.  Joseph Zafarani, Isaac I. Zafarani, and Charles H. Zafarani are collectively referred to as "**Guarantors**" and each, individually, a "**Guarantor**").

14.     Upon information and belief, the "John Doe" defendants constitute those persons or corporations or firms that may be in possession of, or may have contract, possessory, lien or other interests in, the Mortgaged Property.

## JURISDICTION AND VENUE

15.     Jurisdiction is proper under 28 U.S.C. § 1332.

16.     Plaintiff is a corporation organized under the laws of the state of Delaware, with a principal place of business in Illinois.  None of Lender's members are citizens of the state of New York. To the extent any member of Lender is an LLC, none of the members of such LLC is a citizen of the state of New York.

17.     On information and belief, Defendant is a limited liability company organized and existing under the laws of the State of New York, with an address at 3052 Brighton 1st Street, Suite M3, 4th Floor, Brooklyn, New York, 11235, and its members are citizens of the state of New York.

18.     The amount in controversy exceeds $75,000 because it concerns a multi-million dollar property, and over $75,000 in attorneys' fees.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the property in question is located in Kings County, which is situated in the Eastern District of New York.

## THE PROPERTY

20.     The Property that is the subject of this action is known as Block 6706, Lot 48 in the Borough of Brooklyn in the City of New York and located at 1301 Avenue J, Brooklyn, New York 11235.

21.     The Property is improved with a two-story commercial building consisting of approximately 31,575 square feet of leasable space on Avenue J in Brooklyn's Midwood neighborhood, near schools, houses of worship, restaurants, banks, and other retailers.  The Mortgaged Property is near the New York City Transit's Avenue J station, served by the B and Q subway trains, as well as several local and express bus lines.

22.     Upon information and belief, Borrower acquired the Property in 2016 as a tenant in common and became the sole owner of the Property in 2017.

23.     Upon information and belief, the Property includes seven commercial units, and the following tenants: Schweiger Dermatology Group, LLC ("Schweiger"); Brooklyn Eye Surgery Center, LLC as joint tenants with Kochman Lebowitz and Mogh, LLP; Shevy Custom Wigs, Inc.

("Shevy"); Avenue J Q Works, LLC; Baya Bar Avenue J, LLC ("Baya Bar"); Sushi Ta'eem; and Neshama Preschool ("Neshama").

## **THE LOAN AND LIEN INSTRUMENTS**

24.     On or about October 31, 2017, W Financial Fund, LP assigned its interest in Acquisition Mortgage to Inland Mortgage Lending, LLC ("**Inland**"), in the Assignment of Mortgage, recorded on November 13, 2017 in the Register's Office as CRFN 2017000416360, Document ID 2017110600416003.  At that time, Borrower's Acquisition Mortgage was in the amount of $11,000,000.00.

25.     Contemporaneously, Borrower, for the purposes of evidencing additional indebtedness in the amount of $1,400,000.00 to Inland, executed, acknowledged, and delivered to Inland a Gap Mortgage dated October 31, 2017, and recorded on November 13, 2017 in the Register's Office as CRFN 2017000416361, Document ID 2017110600416004 (the "**Gap Mortgage**").

26.     On or about October 31, 2017, for value received, Inland and Borrower executed that certain Loan Agreement, dated October 31, 2017 (together with all amendments, the "**Senior Loan Agreement**").  Pursuant to the Senior Loan Agreement, Inland agreed to loan Borrower the total principal amount of $12,400,000.00, subject to the terms and conditions set forth therein (the "**Senior Loan**").  A true and correct copy of the Senior Loan Agreement is attached hereto as **Exhibit A**.

27.     In connection with the Senior Loan Agreement, on or about October 31, 2017, for value received, Borrower executed and delivered the Amended, Restated and Consolidated Promissory Note ("**Senior Note**"), to evidence Borrower's indebtedness to Inland in the amount of $12,400,000.00.  A true and correct copy of the Senior Note is attached hereto as **Exhibit B**.

28.     On or about October 31, 2017, the Acquisition Loan and the Gap Mortgage were consolidated to form a single lien payable to Inland in the sum of $12,400,000.00, executed, and delivered to Inland in an Amended, Restated and Consolidated Mortgage and Security Agreement dated October 31, 2017, and recorded on November 13, 2017 in the Register's Office as CRFN 2017000416362, Document ID 2017110600416005 (the "**Senior Mortgage**"). A true and correct copy of the Senior Mortgage is attached hereto as **Exhibit C**. The Senior Mortgage consolidated all prior liens on the property into one master mortgage.

29.     As additional security for payment of the Senior Loan, on or about October 31, 2017, Borrower executed and delivered to Inland the following instruments: (i) an ALR, dated October 31, 2017, pursuant to which Borrower assigned to Inland its rights in, among other things, all Lease and Rents at the Property;[2] (ii) an Account Control and Cash Management Agreement, executed on or around November 10, 2017 ("**Cash Management Agreement**"), evidencing Borrower's agreement to establish a Lockbox or clearing account and pursuant to which Borrower granted Inland a continuing lien on and security interest in the Lockbox and the Accounts and all amounts from time to time on deposit therein; (iii) a Conditional Assignment of Management Agreement, dated October 31, 2017 ("**AMA**"), through which Borrower agreed to assign all of Borrower's right, title and interest in and to that certain Property Management Agreement, dated on or about October 31, 2017**.**

30.     As additional security for payment of the Senior Loan, non-parties Joseph Zafarani, Charles Zafarani, and Isaac Zafarani executed and delivered to Inland, that certain Limited Recourse Guaranty, dated October 31, 2017 ("**Senior Guaranty**").  Pursuant to the Guaranty, Joseph Zafarani, Charles Zafarani, and Isaac Zafarani, each as a Guarantor, agreed, among other

---

[2] This document was recorded on November 13, 2017 in the Register's Office as CRFN 2017000416363, Document ID 2017110600416006. A true and correct copy of the ALR is attached hereto as **Exhibit D**.

things, to repay the Senior Loan upon the occurrence of one or more Guaranteed Recourse Obligations of Borrower, defined as all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Article 13 of the Senior Loan Agreement.

31.     On or about December 5, 2019, Inland MC Lending, LLC ("**Inland MC**") agreed to provide a new loan in the principal amount of $250,000 to Borrower (the "**Junior Loan**"), and Borrower executed and delivered a note, dated December 5, 2019, in the principal amount of $250,000.00 ("**Junior Note**").  A true and correct copy of the Junior Note is attached hereto as **Exhibit E**.

32.     As security for the payment of the indebtedness evidenced by the Junior Note, Borrower executed and delivered to Inland MC that certain Mortgage, dated December 4, 2019 ("**Junior Mortgage**").  The Junior Mortgage granted Inland MC a second-priority lien and security interest in the Mortgage Property, and was recorded on December 13, 2019 in the Register's Office as CRFN 2019000407701. A true and correct copy of the Junior Mortgage is attached hereto as **Exhibit F**.

33.     As additional security for payment of the Junior Loan Agreement, Joseph Zafarani, Charles Zafarani, and Isaac Zafarani executed and delivered to Inland MC, that certain Limited Recourse Guaranty, dated December 5, 2019 ("**Junior Loan Guaranty**").  Pursuant to the Junior Loan Guaranty, Joseph Zafarani, Charles Zafarani, and Isaac Zafarani, each as a Guarantor, agreed, among other things, to repay the Junior Loan upon the occurrence of one or more Guaranteed Recourse Obligations of Borrower, defined as all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Article 13 of the Senior Loan Agreement.

34.     The parties amended the Senior Loan six times, each time in writing and following negotiations among the parties and in order to provide the Borrower with additional time to payoff

the loan, including during the COVID-19 pandemic. Specifically, on or around January 29, 2019, October 31, 2019, December 5, 2019, January 31, 2019, and February 28, 2020, the parties executed successive amendments to the Senior Loan, which, among other things, extended the Maturity Date of the Loan.

35. On or about March 31, 2020, the parties executed the Fifth Amendment to the Loan Agreement, dated March 31, 2020, in which Inland's successor-by-assignment, Inland MC, agreed, among other things, to further extend the Maturity Date of the Senior Loan to "May 10, 2020, or such other date on which the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise." A true and correct copy of the Fifth Amendment to the Loan Agreement is attached hereto as **Exhibit G**.[3]

36. The parties also executed three amendments to the Junior Loan, which similarly extended the Maturity Date of the Junior Loan: (i) an Omnibus Amendment to Loan Documents, dated January 31, 2020 ("**First Amendment to Junior Loan Documents**"); an Omnibus Amendment to Loan Documents, dated February 28, 2020 ("**Second Amendment to Junior Loan Documents**"); and (iii) a third Omnibus Amendment to Loan Documents, dated March 31, 2020 ("**Third Amendment to Junior Loan Documents**"), which, among other things, extended the computation and payment section of the Junior Note to May 10, 2020, and simultaneously

---

[3] The Senior Loan Agreement, Senior Note, Senior Mortgage, ALR, Cash Management Agreement, AMA, all amendments to the Senior Loan Agreements, and certain other loan documents are referred to collectively as the "**Senior Loan Documents**."

extended all payment dates under the Junior Loan Documents. A true and correct copy of the Third Amendment to Junior Loan Documents is attached as **Exhibit H**.[4]

37.     On or around June 6, 2018, Inland assigned the Senior Note to Inland MC, as evidenced by that certain Allonge to Amended, Restated and Consolidated Promissory Note, dated on or around June 6, 2018 ("**Allonge**").

38.     On or around August 5, 2020, Inland assigned its interest in the Senior Mortgage to Inland MC through an Assignment of Amended, Restated and Consolidated Mortgage and Security Instrument ("**Assignment of Senior Mortgage**"). The Assignment of Senior Mortgage was recorded in the Register's Office on October 7, 2020 in CFRN 2020000273804, Document ID: 2020092401136001.

39.     On or around August 5, 2020, Inland assigned its interest in the ALR to Inland MC through an Assignment of Assignment of Leases and Rents, dated August 5, 2020 ("**Assignment of ALR**"), and recorded in the Register's Office on August 21, 2020 in CFRN 2020000236000, Document ID 2020080700426001.

40.     On or around December 30, 2020, Inland MC assigned the Senior Note and Junior Note to Lender, as evidenced by that certain Allonge to Amended, Restated and Consolidated Promissory Note, and Allonge to Mortgage Note, respectively. Simultaneously therewith, Inland MC assigned its interest in the Junior Mortgage, Senior Mortgage, and ALR to Lender through three separate assignments. True and correct copies of the allonge to the Senior Note and Junior Note, as well as the assignment of the Senior Mortgage, Junior Mortgage and ALR to Lender are attached hereto as **Exhibits I**, **J**, **K**, **L** and **M**, respectively.

---

[4] The Junior Note, Junior Mortgage, Junior Guaranty, all Omnibus Amendments to the Junior Loan Documents, and certain other documents are referred to collectively as the "**Junior Loan Documents**," and together with the Senior Loan Documents, the "**Junior Loan Documents**."

41.     On or around March 22, 2021, Huntington National Bank ("**Huntington**") executed a Release of Collateral Assignment in favor of Inland, concerning a Collateral Assignment of Note and Mortgage, recorded on March 19, 2018, and satisfied on or around March 22, 2021. The Release of Collateral Assignment was recorded in the Register's Office on April 1, 2021 in CFRN 2021000118915, Document ID 2021032900791001. A true and correct copy of the Release of Collateral Assignment is attached hereto as **Exhibit N**.

## BORROWER DEFAULTS

**A.     The Monetary Default**

42.     On or around May 10, 2020, Borrower failed to pay the outstanding principal balance and accrued interest and other charges, including but not limited to the Loan Maintenance Fee, under the Loan Documents, when the Senior Loan and Junior Loan were due.

43.     On May 21, 2020, Inland MC notified Borrower, by letter dated of same date ("**Default Notice**"), that $13,131,892.39 was due under the Senior Note, and $96,642.35 was due under the Junior Note, and "as a result of Borrower's failure to pay such payments by May 10, 2020, an Event of Default now exists under the Senior Loan and Junior Loan, respectively." A true and correct copy of the Default Notice is attached hereto as **Exhibit O**.

44.     Inland MC also advised that "as a result of the Event of Default, the interest rate on the Senior Loan and Junior Loan will be increased to the Default Rate." *Id.*

45.     In the Default Notice from May 21, 2020, Lender revoked Borrower's ability to collect rent from tenants at the property, as outlined in the ALR.

46.     In the Default Notice, Inland MC specifically advised that the defaults identified are "not intended to be an exhaustive list of each failure of Borrower and/or Guarantors to comply with the respective obligations of Borrower and Guarantors under the Loan Documents.

47.     As of December 1, 2021, the total outstanding amount due under the Senior Loan and Junior Loan is $15,456,990.95, not including attorneys' fees.

**B.      Borrower's Continued Defaults**

48.     Since Borrower first defaulted under the Loan Documents in May 2020, Borrower has engaged in erratic and irrational behavior and repeatedly and willfully ignored the terms of the Loan Documents.   Borrower's actions have resulted in additional defaults under the Loan Documents.

49.     Borrower has refused to provide Lender with all the Rents obtained from the Property despite the Lender's revocation of the ALR.

50.     Lender revoked the Borrower's license to collect Rents in the ALR.  Section 3.1 of the ALR states that, upon an Event of Default, Lender is "immediately [] entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property."

51.     In other words, any Rents collected from the Property since the Event of Default must be provided to the Lender, and Lender is entitled to an order directing all Rents and sums due under any leases in accordance with the terms of the Loan Documents.

52.     On or around June 1, 2020, and again on September 1, 2020, Inland Mortgage Capital, LLC directed tenants at the Property to submit payments directly to Lender.

53.     Upon information and belief, Borrower directed tenants to ignore the communications, and instructed tenants at the Property to submit Rents directly to the Borrower, and contrary to the Lender's rights in the ALR.

54.     Borrower eventually relented and, on or around November 12, 2020, Borrower and Inland Mortgage Capital, LLC sent a joint letter to tenants directing Rents be sent to "1301 Ave J,

LLC, 2901 Butterfield Road, Oak Brook, Illinois 60523." The letter was signed by Borrower's and Lender's principals.

55.     Borrower soon relapsed, however.  Borrower refused to provide information regarding the status of the Property, including an accounting of Rents both paid and due.

56.     In addition, and contrary to the Loan Documents, Borrower has failed, despite repeated requests, to provide information concerning the leases being entered into at the Property, or to provide any regular financial reports on the status of the Property.  *See* **Exhibit A**, Senior Loan Agreement, § 4.14.

57.     Upon information and belief, since Borrower's May 2020 default, several new tenants have leased space in the Property, including Baya Bar, Nasheem Preschool, and Sushi Ta'eem.  Lender was not provided with any of the leases for these tenants prior to their occupancy, as the Loan Documents require.  *See* **Exhibit A**, Senior Loan Agreement, § 4.14.

58.     On or around December 7, 2020, Borrower sued its tenant Kochman Lebowitz and Mogh, LLP ("Kochman") due to Kochman's alleged failure to pay rent to the Landlord beginning in April 2020 at the start of the COVID-19 pandemic and resulting government shutdown orders.

59.     By May 2021, a year after defaulting on the mortgage, rent proceeds continued to be late, and when they arrived, most submissions had gone first through the Borrower rather than directly to the Lender as the parties stated in their joint letter.  Lender also had no way of telling whether all the rent submitted was all rent being collected.

60.     On May 5, 2021, Lender sent a letter to Borrower explaining that "Borrower continues to collect Rent from tenants at the Property," and "Borrower must direct all tenants to pay all Rent directly to Lender, or immediately implement a lockbox under Lender's control to ensure Lender obtains all Rent."

61. Lender also requested an "updated rent roll detailing the building's current tenants, their respective monthly rents, and their payments to date," and informed Borrower that he "has failed to provide leases for Lender's approval, as required by the Loan Documents," and that all judgments or settlements from any litigation with tenants "inures to Lender's benefit."

62. Lender specifically noted the landlord-tenant litigation with Kochman and explained that any judgment or settlement should accrue to the Lender, not Borrower, pursuant to the ALR.

63. Following this letter, Borrower still refused to provide an accounting of the Rent or disclose whether Rent was being sent to Lender in accordance with the ALR. The minimum information that was provided showed that only three of the tenants were paying rent: Schweiger in the amount of $18,571.14 per month, Shevy in the amount of $10,000 per month, and Baya Bar in the amount of $5,000 per month. In addition, new tenants were occupying the Property, even though Borrower had not provided any leases for Lender to review, including Neshama and Sushi Ta'eem.

64. On June 29, 2021, Lender sent letters directly to tenants demanding that Rent be remitted directly to Lender, as is Lender's right. Lender enclosed a copy of the default letter and the ALR itself. A true and correct copy of the letter sent to tenant Sushi Taeem Corp., is attached as **Exhibit P**. The letter to Sushi Taeem is materially identical to the letter sent to the other tenants.

65. In response, Borrower directed tenants to "ignore" the Lender's letter and to continue to submit Rent to the Lender. Unbeknownst to the tenants, however, and upon information and belief, Borrower kept the Rent for himself instead of submitting it to the Lender.

66. Upon information and belief, Borrower settled its dispute with its tenant Kochman, and has collected Rents from Kochman in settlement of the case. Borrower has not submitted

these Rents to the Lender despite its obligation to do so under the ALR, and Lender's direction in its May 5 letter.

67.     On August 2, 2021, Borrower took the extraordinary step of sending tenants a letter that "reject[ed]" Lender's June 29 letter, claiming it is "unsupported by law and fact."  In support of this erroneous statement, Borrower's identified a purported "termination" of ALR filed by Huntington on January 11, 2021.  A true and correct copy of the letter is attached as **Exhibit Q**.

68.     Borrower, of course, knew all along that the ALR was not terminated, nor was the mortgage with Lender satisfied.  The Borrower has no relationship with Huntington and knew well that the mortgage was held by IMC.  In fact, Borrower was seeking to satisfy the mortgage at that same moment, and made representations in signed affidavits to the Supreme Court of New York, Kings County, that the mortgage was in effect.

69.     The purported "termination" of ALR and a related "satisfaction of mortgage" filed by Huntington were done in error, and Lender advised as much in a letter dated August 18, 2021.

70.     On October 6, 2021, Lender's counsel sent Borrower's counsel another letter regarding Borrower's August 2, 2021 letter, and enclosed an affidavit from Huntington stating that "Huntington inadvertently and erroneously executed the 1301 Avenue J Mortgage Satisfaction and 1301 Avenue J ALR Satisfaction."  A true and correct copy of the letter and affidavit from Huntington is attached as **Exhibit R**.

71.     Huntington subsequently commenced a quiet title action in New York State Supreme Court, Kings County.  *See Huntington National Bank v. Inland Mortgage Lending LLC, et al.*, Case No. 527268/2021 (Sup. Ct. Kings Cnty. 2021).  In that action, Huntington seeks an order that (i) the discharge of mortgage erroneously executed on December 30, 2020 and recorded

on January 15, 2021 and (ii) the termination of assignment of rents erroneously executed on December 30, 2020 and recorded on January 15, 2021 are null and void.

72.     Rent payments to Lender have ceased.  Upon information and belief, Borrower continues to collect Rent from the tenants.  Based on the rental income last provided in May 2021, Borrower is likely collecting *at least* $33,571,14 per month in total from Schweiger, Shevy and Baya bar.  The actual collection is likely much higher, however, since Neshama occupies a prominent space in the Property, the litigation with Kochman has been resolved, and Sushi Ta'eem has opened.  Upon information and belief, Borrower is holding all rent amounts for itself.

73.     In addition to Borrower's failure to remit Rent or settlement proceeds, Borrower has engaged in substantial renovations at the Property without first seeking Lender's consent as required under the Loan Documents.  *See* **Exhibit A**, Senior Loan Agreement, § 4.14.

74.     Borrower's failure to pay for services provided has resulted in five mechanics liens recorded against title to the property: four filed by ORBA Electric Inc. in the amount of $138,447.63, $161,482.33, $53,522.39 and $63,722.30, and another filed by BHY Contractor Inc. in the amount of $763,770.34. The liens, filed on July 7, 2021, total over $1.18 million. *See* **Exhibit S**.

75.     Furthermore, while Lender paid real estate taxes due in July 2021, Lender will not make Borrower's semi-annual real estate tax payment due on January 1, 2022. Upon information and belief, Borrower has not paid real estate taxes on the Property, and is not likely to do so by the upcoming payment deadline.

76.     Finally, Borrower's erratic behavior is also evidenced by its behavior in this Court. Borrower initiated a baseless case against the Lender seeking to enforce a non-existent agreement for a reduced payoff of the loan for $13,000,000, subject to an indefinite extension.  Lender then

removed the case to this Court, and the Honorable William F. Kuntz, II granted Lender's request to file a motion to dismiss and a motion for a receiver. Borrower then voluntarily dismissed its case on the eve of Lender filing its receiver motion.

77. In all events, Borrower's assertion are not correct. Lender never agreed to amend the Loan Documents to accept a reduced payoff, and as noted above, every one of the **nine** amendments to the Loan Documents were documented in writing, as well as a November 2020 payoff agreement that expired by its own terms in December 2020. The written modifications were all consistent with the terms of the Loan Documents, which require any modification to be in writing.

## NO WAIVER OF OTHER REMEDIES

78. Lender does not waive their right to amend the Complaint in this action or to take such other action as may be appropriate pursuant to the Mortgage.

79. Lender has complied with all state and federal statutes, Executive Orders, Administrative Orders, Acts and directives instituted as a result of the COVID-19 pandemic.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Appointment of Temporary Receiver)

80. Lender repeats and realleges the allegations contained in paragraphs 1 through 79. as though fully set forth herein.

81. Plaintiff's primary recourse for repayment of the Loan is the collateral securing the Loan.

82. Among Lender's rights and remedies upon the occurrence of an Event of Default is to have a receiver appointed, without notice and without regard for the adequacy of the security of the Senior Mortgage.

83.     The Loan Documents expressly allow Lender to seek, and indicate Borrower's express consent to, the appointment of a receiver upon the occurrence of an Event of Default.

84.     Section 8.1(g) of the Senior Mortgage provides that upon the occurrence and during the continuance of any Event of Default, Lender may "seek and obtain the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor or indemnitor under the Loan or any other Person liable for the payment of the Debt."

85.     As noted above, Section 3.1 of the ALR explains that, upon an Event of Default, Lender is "immediately [] entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property." In other words, any Rent collected from the Property since the Event of Default must be provided to the Lender.

86.     The Lender may thereupon "enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom . . . and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand."

87.     Likewise, Section 5 of the Junior Mortgage provides that "the holder of this mortgage, in any action to foreclose it, shall be entitled to the appointment of a receiver."

88.     The Leases, the Rents, the books, records, and other property relating to the ownership and operation of the Mortgaged Property (the "Borrower's Assets") are the sole assets of Borrower.

89.     Borrower and its agents are still in possession of Borrower's Assets.

90.    Lender, as an interested and secured party, is potentially threatened with materials losses and injuries, including the Borrower's Assets suffering continuous waste and a dissipation or diminution in value, if Borrower remains in control of Borrower's Assets.

91.    Therefore, in accordance with the Loan Documents and Rule 66 of the Federal Rules of Civil Procedure, Lender, as a secured creditor, asks the Court to appoint a receiver to take immediate possession of and hold, subject to the discretion of this Court, the Mortgaged Property and Borrower's Assets.

92.    Lender requests a trial by jury.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Recovery of Attorneys' Fees)

93.    Lender repeats and realleges the allegations contained in paragraphs 1 through 92 as though fully set forth herein.

94.    Pursuant to the terms of the Loan Documents, Lender is entitled to recover from Borrower its reasonable attorneys' fees, costs and expenses incurred in connection with this action.

95.    Lender has incurred costs, expenses, and reasonable attorneys' fees in connection with this action, in a sum not yet ascertainable, but which will, upon information and belief, exceed the sum of $100,000.

96.    By reason of the foregoing, there is due and owing to Lender an additional sum in an amount to be determined by the Court, for costs, expenses and reasonable attorneys' fees incurred in connection with this action in a sum not yet ascertainable, but which will, upon information and belief, exceed the sum of $100,000.00.

97.    Lender requests a trial by jury.

**WHEREFORE**, Lender demands judgment as follows:

A.　　On its First Cause of Action, the appointment of a receiver of the Mortgaged Property and Borrower's Assets, and an order directing all tenants in possession of the Mortgaged Property to pay the appointed receiver all rent;

B.　　On its Second Cause of Action against Borrower, in an amount to be determined by the Court, but which amount is believed to exceed the sum of $100,000.00, together with costs allowances and disbursements of this action;

C.　　That Lender have such other and further relief as the Court deems just and proper.

Dated: November 30, 2021　　　　　　　　　　　Respectfully submitted,
New York, New York　　　　　　　　　　　　　**DLA PIPER LLP (US)**

　　　　　　　　　　　　　　　　　　　　　　　*/s/ Neal Kronley*
　　　　　　　　　　　　　　　　　　　　　　　Neal Kronley
　　　　　　　　　　　　　　　　　　　　　　　John O. Wray
　　　　　　　　　　　　　　　　　　　　　　　1251 Avenue of the Americas
　　　　　　　　　　　　　　　　　　　　　　　New York, NY 10014
　　　　　　　　　　　　　　　　　　　　　　　(212) 335-4500
　　　　　　　　　　　　　　　　　　　　　　　Neal.Kronley@us.dlapiper.com
　　　　　　　　　　　　　　　　　　　　　　　John.Wray@us.dlapiper.com

　　　　　　　　　　　　　　　　　　　　　　　*Counsel for Plaintiff*
　　　　　　　　　　　　　　　　　　　　　　　*IMC Lending, LLC*

## SCHEDULE A

The Mortgaged Property is that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

a. BEGINNING at the corner formed by the intersection of the northerly side of Avenue J with the easterly side of East 13th Street;

b. RUNNING THENCE northerly along the easterly side of East 13th Street, 180 feet;

c. THENCE easterly parallel with Avenue J, 100 feet;

d. THENCE southerly parallel with East 13th Street, 180 feet to the northerly side of Avenue J; THENCE westerly along the northerly side of Avenue J, 100 feet to the corner, the point or place of BEGINNING.